UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALLISON SNIPES,

    Plaintiff,

v.

ROBERT WILKIE, et al.,

    Defendants.

Case No. 18-cv-03259-TSH

**ORDER RE: MOTION TO DISMISS**

## I. INTRODUCTION

Allison Snipes was a recent college graduate working at the Veterans Affairs ("VA") Geriatric Research, Education and Clinical Center when she allegedly experienced discrimination, harassment, retaliation, invasion of her privacy, and the intentional infliction of emotion distress by her mentor, Elizabeth Turner-Nichols. This alleged harassment led not only to a hostile work environment but also to the breakdown of Snipes's relationship with her family when Turner-Echols instructed Snipes to call her family and reveal secrets that caused her to be ostracized. Pending before the Court is a motion to dismiss brought by Defendants United States, VA Secretary Robert Wilkie, and Turner-Nichols. Mot. to Dismiss ("Mot"), ECF No. 28. Snipes filed an Opposition ("Opp. to Mot.") (ECF No. 30) and Defendants filed a Reply ("Reply to Opp.") (ECF No. 31). Having considered the parties' positions and relevant legal authority, the Court **GRANTS** Defendants' motion for the following reasons.

## II. BACKGROUND

### A. Factual Background

Snipes is a young, unmarried, African-American woman. Second Amended Complaint, ECF No. 26 ¶ 14. Her father is an ordained pastor in the Pentecostal Church presiding over the local congregation. *Id.* ¶ 14. As Snipes understands them, the doctrines of the Pentecostal Church are strict, especially as applied to women. *Id.* ¶ 15. For example, women are prohibited from

cutting their hair, wearing pants, or wearing make-up or nail polish, and women must wear dresses fully covering their legs and arms. *Id.* The Pentecostal Church also has strict prohibitions concerning contact with the opposite sex. *Id.* It categorically prohibits intimate, sexual or romantic relationships before marriage. *Id.* As Snipes is the daughter of a pastor, she believes these rules applied with additional force to her. *Id.*

In 2013, she moved across the country to the Bay Area to study at the University of San Francisco, where she earned a Master's Degree in Economics in 2015. *Id.* ¶ 16. In 2014, Snipes began working for the VA Chief of Staff as an Informatics Intern. *Id.* ¶ 17. In 2015, Snipes became Program Specialist and Stanford Geriatric Medicine Fellowship Coordinator at the VA, where she reported to and was mentored by Turner-Nichols. *Id.*

As the Administrative Officer for GRECC, Turner-Nichols managed all administrative functions for a group of fifty or more employees. *Id.* ¶ 18. Turner-Nichols has worked at the VA for over two decades. *Id.* She boasted to Snipes about having powerful allies throughout the VA, including in Washington, DC. *Id.* She bragged about working in intelligence and surveillance. *Id.* She boasted about having access to and influence over confidential Equal Employment Opportunity ("EEO") investigations. *Id.* She boasted about having influence over employees through the union where her brother is a "high ranking" member. *Id.*

Turner-Nichols often expressed to Snipes her contempt for religious people, especially those who did not follow the religious beliefs they professed to hold. *Id.* ¶ 20. Turner-Nichols took action when she discovered that Snipes, an unmarried woman, was having a romantic relationship with a man in violation of the strict Pentecostal rules. *Id.* Snipes does not know how Turner-Nichols discovered that she was in a romantic relationship. *Id.* Snipes never told Turner-Nichols, or anyone else who she worked with, about the relationship. *Id.*

Turner-Nichols wanted to punish, shame and humiliate Snipes. *Id.* ¶ 21. Therefore, on June 26, 2016, Turner-Nichols summoned Snipes to her office and ordered Snipes to call her parents then and there and "come clean." *Id.* Turner-Nichols insisted that Snipes, in the presence of Turner-Nichols, reveal all the intimate details of her romantic activities to her parents. *Id.* Snipes was sobbing, begging her mentor and supervisor not to make her do it, explaining that it

would destroy her relationship with her parents and her church. *Id.*

Turner-Nichols stayed in the room during the phone call. *Id. ¶* 22. Further, throughout the call, when Snipes hesitated or showed reluctance to answer questions, Turner-Nichols would insist that Snipes must tell her parents everything. *Id.* Snipes has been spiritually, emotionally and financially cut off from her parents and excommunicated from her church. *Id.*

In August 2016, Turner-Nichols continued to punish and harass Snipes, this time off-site at the national conference for Blacks in Government. *Id. ¶* 23. Turner-Nichols openly expressed her anger about Snipes being elected to a position in Blacks in Government, publicly berated and humiliated her, and pressured Snipes to renounce that position and her membership or face further retaliation. *Id.* Likewise, Turner-Nichols ostracized, abandoned and ignored Snipes and stated that Snipes "smelled like shit," was "evil" and "fake," and "would have to sell her soul to the devil to be successful." *Id.*

Thereafter, Turner-Nichols discriminated and retaliated against and harassed Snipes by: repeatedly threatening to fire her; ignoring and ostracizing Snipes at work; rejecting Snipes' requests for overtime; removing her responsibilities; refusing to provide training; excluding Snipes from meetings; closely monitoring Snipes's emails; demanding the return of Snipes's office keys; issuing a disciplinary letter; micromanaging, over-criticizing, over-analyzing and sabotaging Snipes's work; and disparaging Snipes to other staff and employees. *Id. ¶* 24.

Turner-Nichols told Snipes that, if she complained to the EEO, she better be ready for a fight because Turner-Nichols would do whatever it took to win. *Id. ¶* 25. Turner-Nichols explained that she had powerful allies and that no one in the local EEO would or could help her. *Id.* She demonstrated her access to and influence with EEO decision-makers by openly discussing confidential EEO investigations of other employees in front of Snipes. *Id.* She went so far as to threaten to have Snipes investigated by EEO/ORM. *Id.*

Turner-Nichols used the same intimidation tactics to prevent Snipes from complaining to her union. *Id. ¶* 26. Turner-Nichols boasted about using her brother to influence and/or coerce union actions, mediations or investigations. *Id.* She boasted to Snipes that with one call she was able to shut down a union grievance. *Id.* She laughed openly in front of Snipes about how she

3

intimidated VA leadership through her brother. *Id.* She also boasted about using her brother's presence as an intimidation tactic when she had conflicts with staff or superiors. *Id.* She used this tactic against Snipes.

On November 7, 2016, Snipes complained to Dr. Azhar about Turner-Nichols' discrimination, harassment and retaliation. *Id.* ¶ 27. Dr. Azhar promised to keep the complaint confidential. *Id.* However, Turner-Nichols found out about it and promptly punished Snipes. *Id.*

On December 16, 2016, Turner-Nichols issued a disciplinary letter to Snipes and orally stated that Snipes was being disciplined for complaining to Dr. Azhar and admitting she was doing so in retaliation. *Id.* ¶ 28. That same day, Snipes complained to Dr. Goldstein and again on January 19 and 20, 2017. *Id.* Snipes requested a transfer out of the department but for weeks was forced to continue working in close contact with Turner-Nichols. *Id.* Turner-Nichols continued to ostracize Snipes, remove her responsibilities, deny training opportunities, exclude Snipes from meetings, sabotage her work, and disparage Snipes to other staff and employees. *Id.* ¶ 29. On February 8, 2017, Snipes called the EEO hotline and provided requested information to commence an investigation. *Id.* ¶ 30.

**B.     Procedural Background**

On April 19, 2017, Snipes filed a formal complaint with EEO office on VA Form 4939, Complaint of Employment Discrimination, alleged discrimination, harassment and retaliation. *Id.* ¶ 5. On June 13, 2017, the complaint was accepted for investigation under the supervision of the Office of Resolution Management ("ORM") and assigned for investigation on August 22, 2017. *Id.* ¶ 6. On October 17, 2017, the resulting report was submitted for the consideration of the Regional EEO Office. *Id.* ¶ 7. On November 22, 2017, the VA Office of Resolution Management provided Snipes with a copy of the investigative file and advised Snipes of further complaint processing rights. *Id.* ¶ 8.

On November 28, 2017, Snipes timely requested a final agency decision ("FAD") from the Office of Employment Discrimination Complaint Adjudication ("OEDCA") to the ORM. *Id.* ¶ 9. On January 25, 2018, Snipes filed a Standard Form 95 Claim for Damage, Injury or Death for a Federal Tort Claim Act ("FTCA") claim against the United States. *Id.* ¶ 10. On February 26,

2018, Snipes received a letter from the VA Office of General Counsel denying Snipes's claims pursuant to the FTCA. *Id.* ¶ 11. On March 5, 2018, the VA issued its Final Agency Decision Or Order regarding Snipes's complaint(s) of employment discrimination and explaining Snipes's right of appeal and right to file a civil action in accordance with EEOC Regulation 29 C.F.R. §1614.110(b). *Id.* ¶ 12.

On May 31, 2018 Snipes filed her original complaint. ECF No. 1. On October 12, 2018 she filed her First Amended Complaint. ECF No. 21. On November 5, 2018, she filed a Second Amended Complaint ("SAC"). ECF No. 26. In her operative SAC, Snipes alleges (1) violation of Title VII on the basis of sex discrimination against Defendant VA; (2) violation of Title VII on the basis of religious discrimination against Defendant VA; (3) violation of Title VII on the basis of retaliation against Defendant VA; (4) violation of Title VII on the basis of hostile work environment against Defendant VA; (5) invasion of privacy under California Constitution, Article I § 1, against Defendants VA, United States, and Turner-Nichols; (6) intentional infliction of emotional distress against Defendants VA, United States, and Turner-Nichols; and (7) a *Bivens* claims for violation of civil rights against Defendants VA, United States, and Turner-Nichols.

Defendants responded with the present motion. ECF No. 28. In their motion, Defendants move the Court for an order dismissing (1) Snipes's tort claims for invasion of privacy (Fifth Cause of Action) and intentional infliction of emotional distress ("IIED") (Sixth Cause of Action) and (2) Snipes's *Bivens* claim (Seventh Cause of Action) pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Mot. at 2-3. Defendants do not move to dismiss Snipes's Title VII claims. Mot. at 3.

### III. LEGAL STANDARD

#### A. Rule 12(b)(1)

Federal district courts are courts of limited jurisdiction; "[t]hey possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted). Accordingly, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.*; *Chandler v. State Farm Mut. Auto.*

5

*Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to move to dismiss a lawsuit for lack of subject matter jurisdiction. A jurisdictional challenge may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Where the attack is facial, the court determines whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations in the complaint as true and construing them in favor of the party asserting jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Where the attack is factual, however, "the court need not presume the truthfulness of the plaintiff's allegations." *Safe Air for Everyone*, 373 F.3d at 1039. In resolving a factual dispute as to the existence of subject matter jurisdiction, a court may review extrinsic evidence beyond the complaint without converting a motion to dismiss into one for summary judgment. *Id.*; *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (holding that a court "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction").

**B.      Rule 12(b)(6)**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted).

A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

6

cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). In addition, courts may consider documents attached to the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotations and citations omitted). However, the Court may deny leave to amend for a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## IV. DISCUSSION

### A. Preemption

Defendants argue that Snipes's tort claims are preempted by both Title VII and the Civil Service Reform Act of 1978 ("CSRA"). Mot. at 3. Defendants contend that Title VII is the exclusive remedy for employment discrimination claims by federal employees such as Snipes. Furthermore, Defendants argue the CSRA provides an "exclusive and preemptive" remedial scheme for federal employees to obtain relief where a federal agency has engaged in a prohibited personnel practice. *See Mangano v. United States*, 529 F.3d 1243, 1246 (9th Cir. 2008). Additionally, Defendants argue that because Snipes's tort claims are based on the same alleged conduct underlying her Title VII claims, her tort claims should be dismissed. Snipes argues that Title VII does not preempt tort claims based on "highly personal wrongs" such as, forcing a young, female subordinate to disclose a secret to her family. Opp. to Mot. at 5. For the same

reasons, Snipes argues the CSRA has no application here. *Id.*

### 1. Title VII

It is well settled that Title VII is the exclusive remedy for claims of discrimination and retaliation arising out of federal employment. *See Brown v. GSA,* 425 U.S. 820, 829 (1976) (stating that Title VII is "an exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination."); *see also Phelps v. U.S. General Services Agency,* 2008 WL 4287941, 2 (N.D. Cal. 2008) ("Title VII is the exclusive remedy for all acts of discrimination by the federal government, whether the alleged discrimination is based on race, religion, sex, national origin, or retaliation."). However, Title VII does not preclude separate remedies for "highly personal violation[s] beyond the meaning of 'discrimination.'" *Otto v. Heckler,* 781 F.2d 754, 757 (9th Cir. 1986); *see also Brock v. United States,* 64 F.3d 1421, 1423 (9th Cir. 1995) (concluding that plaintiff's rape and sexual assault claims were highly personal and, therefore, that Title VII was not the plaintiff's exclusive remedy).

Applying those principles here, Snipes's non-Title VII claims for invasion of privacy and the intentional infliction of emotional distress are not preempted by Title VII because the underlying conduct need not necessarily have been driven by discrimination. In *Otto*, the employee alleged a "variety of common law torts including assault, invasion of privacy, intentional infliction of emotional distress and defamation" based on her supervisor's defamatory remarks about her sexuality and harassing phone calls. 781 F.2d at 755. The Ninth Circuit held that these harms were "highly personal" beyond mere discrimination and, therefore, Title VII did not bar the tort claims. *Id.* Here, Snipes's privacy and IIED claims are based on the forced disclosure to her parents of personal information, which caused her to be ostracized. That this unwanted conduct is *also* the basis for her Title VII claims does not change the fact that this "conduct also constitutes more than . . . discrimination." *Brock*, 64 F.3d at 1423. Accordingly, her tort claims are not preempted by Title VII.

### 2. CSRA

The CSRA creates a remedial scheme by which a federal employee can challenge a supervisor's "prohibited personnel practice." *Mangano,* 529 F.3d at 1246. If the challenged

8

conduct falls within the scope of the CSRA's "prohibited personnel practices," the CSRA's administrative procedures are the employee's only remedy. *Id.* The CSRA's remedial scheme is "both exclusive and preemptive" because permitting FTCA claims to supplant the CSRA's remedial scheme would defeat Congress' purpose of creating "a single system of procedures and remedies subject to judicial review." *Rivera v. United States,* 924 F.2d 948, 951 (9th Cir. 1991). Thus, where Congress has provided a way to process prohibited personnel practices, other potential remedies are preempted. *Mangano,* 529 F.3d at 1246. "Personnel action" is broadly defined to include any appointment, promotion, disciplinary or corrective action, detail, transfer, or reassignment, reinstatement, restoration, reemployment, performance evaluation, decision concerning pay or benefits, mandatory psychiatric evaluation, or any other significant change in duties, responsibilities, or working conditions. *See* 5 U.S.C. § 2302(a)(2)(A)(i)-(xi); *Brock,* 64 F.3d at 1424–25. There are limits as to what qualifies as personnel action, but those examples are "well outside anything that could reasonably be described as personnel action." *Mangano,* 529 F.3d at 1247.

In *Saul v. United States,* the Ninth Circuit concluded that while the CSRA defined "personnel action" so as to incorporate any "'disciplinary or corrective action,'" it was not the intent of congress to confine the scope of "personnel actions" so narrowly as to exclude actions having no effect on pay or rank. 928 F.2d 829, 833 (9th Cir. 1991). Rather, the Ninth Circuit concluded the scope of employer "personnel actions" by the CSRA was broad enough to the allegation of "supervisors' violations of employees' constitutional and privacy rights." *Id.* at 834. The court stopped short of announcing any criteria for determining which constitutional violations should be included or excluded from the CSRA and held only that the term "'corrective action' in [5 U.S.C.] section 2302 can be read broadly enough to encompass the mail opening [by a supervisor] before us." *Id.*

The issue the *Saul* court left largely unaddressed—what considerations are relevant in the determination of what is or is not a "personnel action"—was addressed more thoroughly in *Collins v. Bender,* 195 F.3d 1076 (9th Cir. 1999). Both *Collins* and *Saul* addressed facts giving rise to allegations of Fourth Amendment violations by supervisory officers of federal agencies.

9

Factually, what differentiated the two cases is that in *Saul* the alleged infringement occurred when a supervisor seized and opened mail that was addressed to the plaintiff at work, *Saul,* 928 F.2d at 831, whereas in *Collins,* the alleged Fourth Amendment infringement occurred at the plaintiff's home when personnel from the agency entered the plaintiff's home without a warrant and seized firearms belonging to the plaintiff. *Collins,* 195 F.3d at 1077. While the *Collins* court held that the location of the alleged infringement was a factor for consideration, it was not determinative. *Id.* at 1079. Rather, the focus in *Collins* was on the degree to which the complained-of action was connected with, or merely tangential to, the plaintiff's employment. *See id.* ("Any connection between the defendants' search and [the plaintiff's] employment was, at best, attenuated.").

Here, the Court finds Snipes's claims are not preempted by the CSRA because the Court finds that the alleged forced phone call lies outside the meaning of the term "personnel action." While it is true that Snipes's claims regarding supervision, training, overtime pay decisions, and discipline all concern personnel actions within the meaning of the CSRA, and thus any tort claims premised on that same conduct are preempted, *see Mangano*, 529 F.3d at 1246, the Defendants do not address Snipes's argument that the phone call where Turner-Nichols ordered Snipes to disclose intimate details of her life to her family does not fall within any category of "prohibited personnel action." Opp. to Mot. at 17. The closest they come to addressing this is when they state that perhaps Turner-Nichols was forcing Snipes to make the call out of a concern for her well being, which is unconvincing, contradicts the allegations in the SAC, and also has nothing to do with CSRA preemption. Accordingly, Snipes's claims are not preempted by CSRA.

**B.     Plaintiff's Tort Claims**

Next, Defendants argue that even if the Court has jurisdiction to consider the tort claims, the SAC does not state a claim for invasion of privacy or the intentional infliction of emotional distress under California law. Mot. at 11.

**1.     Invasion of Privacy**

Defendants argue that Snipes fails to state a claim for any of the four common law invasion of privacy torts: "(1) intrusion upon seclusion, (2) public disclosure of private facts, (3) false light in the public eye, and (4) appropriation of name or likeness." *Robinson v. Managed*

10

*Accounts Receivables Corp.*, 654 F. Supp. 2d 1051, 1062-63 (C.D. Cal. 2009). With respect to the privacy claim in particular, Defendants argue that Snipes chose to disclose her private romantic life information on the phone call in front of her supervisor where she had no reasonable expectation of privacy. Mot. at 3; *see* SAC at ¶¶ 21-22, 59. Additionally, Defendants argue that the disclosure by Snipes to her parents does not constitute a tortious disclosure of private facts, because the disclosure was not to enough people. Mot. at 3. Snipes argues that Turner-Nichols forced Snipes to reveal intimate details of her romantic life to her own family by use of her authority and that this action constitutes an invasion of her privacy under the law. Opp. to Mot. at 11-12. (Snipes disclaims reliance on false light in the public eye or appropriation of name or likeness. *See* Opp. at 13.)

California recognizes four categories of the tort of invasion of privacy: (1) intrusion upon seclusion, (2) public disclosure of private facts, (3) false light in the public eye, and (4) appropriation of name or likeness. *Inzerillo v. Green Tree Servicing LLC,* 4 No. 13–CV–06010–MEJ, 2014 WL 1347175, at *3, *6 (N.D. Cal. Apr. 3, 2014). An action for invasion of privacy by intrusion upon seclusion has two elements: (1) an intrusion into a private place, conversation, or matter (2) in a manner highly offensive to a reasonable person. *Id.* (citing *Taus v. Loftus,* 40 Cal.4th 683, 725 (2007); *see also Deteresa v. Am. Broad. Cos., Inc.,* 121 F.3d 460, 465 (9th Cir. 1997) ("One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."). The intrusion must be intentional. *Id.* Effective consent negates an intrusion upon seclusion claim. *See* Restatement (Second) of Torts § 892A (1979) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it."). Under California law, there are three elements of a claim for public disclosure of private facts: (1) the disclosure must be public, (2) the facts must be private facts that have not been disclosed to the public, and (3) the matter made public must be one which would be offensive and objectionable to a reasonable person of ordinary sensibilities. *Daly v. Viacom, Inc.,* 238 F. Supp. 2d 1118 (N.D. Cal. 2002).

11

The SAC, as pled, is insufficient to state a claim for invasion of privacy. In the SAC, Snipes alleges that *she* made the call to her parents, not Turner-Nichols. SAC ¶ 21. Next Snipes alleges that *she* placed that call with the awareness that Turner-Nichols was in the same room. *Id.* ¶ 22. The tort of invasion of privacy by intrusion is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation, or data source which is penetrated by defendant. *Sanders v. Am. Broad. Companies, Inc.,* 20 Cal. 4th 907 (1999). Since Snipes revealed this information to her parents and in Turner-Nichols's presence, she could not have had a reasonable expectation of privacy from the very people to whom she disclosed it. *Id.* ¶ 21. Her phone call in the presence of her supervisor effectively constituted consent to the intrusion, and a plaintiff cannot have a reasonable expectation of privacy if she consented to the intrusion. *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 26 (1994) ("The plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant."). As to Snipes's possible public disclosure of private acts claim, this too fails because disclosure to two persons, her mother and father, does not constitute disclosure to the public. *Kinsey v. Macur*, 107 Cal. App. 3d 265, 270 (1980) ("[E]xcept in cases involving physical intrusion, the tort [of public disclosure of private facts] must be accompanied by publicity in the sense of communication to the public in general or to a large number of persons as distinguished by one individual or a few."). Accordingly, Snipes has not alleged a claim for the invasion of privacy.

### 2. Intentional Infliction of Emotional Distress

Defendants argue that Snipes has not alleged "extreme and outrageous conduct" that is "so extreme as to exceed all bounds of that usually tolerated in a civilized community" to meet the requirements of an IIED claim. Snipes argues that her allegation that Turner-Nichols engaged in intentional sexual harassment, discrimination, and retaliation and intentional religious harassment, discrimination and retaliation is sufficient for pleading IIED. Opp. to Mot. at 13.

The elements of a claim for intentional infliction of emotional distress are: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing

12

emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress." *Cole v. Fair Oaks Fire Protection District,* 43 Cal. 3d 148, 155 n.7 (1987); *see also Lee v. Aiu,* 936 P.2d 655, 670 n.12 (1997). As the court noted in *Cole,* this tort imposes liability for "conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress." *Id.*

Pleading intentional infliction of emotional distress requires allegations beyond mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Haley v. Cohen & Steers Capital Mgmt., Inc.*, 871 F. Supp. 2d 944 (N.D. Cal. 2012). To that end, numerous instances of alleged sexual threats and insults in the workplace have been held to fall short of the level of "outrageous" required to satisfy an IIED claim. *See Delfino v. Agilent Techs., Inc.,* 145 Cal. App. 4th 790, 809 (2006) (anonymous e-mails graphically threatening physical harm insufficient); *Candelore v. Clark County Sanitation Dist.,* 975 F.2d 588, 590 (1992) (isolated incidents of sexual horseplay alleged by plaintiff took place over a period of years and were not so egregious as to support an IIED claim). Moreover, particularly with respect to criticism directed at an employee's work, courts have held that "rude" or "insensitive" remarks do not on their own justify an IIED claim. *See Schneider v. TRW, Inc.,* 938 F.2d 986 (9th Cir. 1991) (summary judgment granted where plaintiff alleged that supervisor "screamed and yelled in the process of criticizing her performance, threatened to throw her out of the department and made gestures she interpreted as threatening").

Here, Snipes's argument that her Title VII claims "alone" establish that she has satisfied the pleading standard for IIED is incorrect as the conduct was not "outrageous." *Zeiny v. United States*, No. 5:13-CV-01220 EJD, 2014 WL 1051641, at *5 (N.D. Cal. Mar. 17, 2014) (finding that Plaintiff's allegations that he was "harassed, mistreated, treated like a criminal and treated different than his coworkers" and that he was asked to perform tasks that his manager and supervisor would then report as unauthorized to, even if credited as true, did not constitute that type of "extreme and outrageous" conduct that could support an intentional infliction of emotional distress claim in the context of employment, even if Plaintiff was terminated as a result), *aff'd,* 659 F. App'x 435 (9th Cir. 2016). Even viewing the totality of Snipes's allegations, there are

insufficient facts to satisfy the "outrageous" element, as that element has been construed by the courts. Snipes's allegations consist entirely of verbal threats with the exception of the forced phone call which, itself, suffers from an issue of causation as far as an IIED claim is concerned. Snipes herself dialed her parents' phone number and decided to disclose to them her romantic life. SAC ¶ 21. And it was as a consequence of this disclosure, not Turner-Nichols calling Snipes into the office and speaking to her, which led to Snipes' parents cutting her off "spiritually, emotionally, and financially." *Id.* ¶ 22. Accordingly, Snipes has not alleged conduct that satisfies the outrageous and causation elements of IIED.

### C. Proper Defendants under FTCA

Third, Defendants argue that even if Snipes had stated a tort claim under California law based on the alleged conduct of a federal employee, the United States is the only proper defendant to such a claim under the FTCA. Mot. at 17; *see* 28 U.S.C. § 2679. Defendants argue that because Turner-Nichols' conduct has been deemed within the scope of her federal employment (*see* ECF No. 22), she is thus personally immune from state tort liability. *Id.* at 17-18; *Otto,* 781 F.2d at 758. Defendants argue that the VA and Turner-Nichols should be dismissed as defendants to Snipes's tort claims, leaving the United States as the sole proper defendant. *Id.; see Kennedy v. U.S. Postal Service,* 145 F.3d 1077, 1078 (9th Cir. 1998) (affirming dismissal of improperly named defendants in FTCA action). Snipes argues that Turner-Nichols committed a "highly personal wrong" against her because Turner-Nichols acted with extreme cruelty, knowing the harm she was causing to Snipes's personal relationships with her family and church. Opp. to Mot. at 15.

The Federal Employees Liability Reform and Tort Compensation Act (FELTRCA), also known as the Westfall Act, immunizes United States employees for their negligent or wrongful acts or omissions while acting within the scope of their office or employment. *See* 28 U.S.C. § 2679(b); *Green v. Hall,* 8 F.3d 695, 698 (9th Cir. 1993). The FTCA is the exclusive remedy for tortious conduct by the United States, and it only allows claims against the United States. *FDIC v. Craft,* 157 F.3d 697, 706 (9th Cir. 1998); *Heine v. Vilsack*, No. 1:12-CV-01992-AWI, 2014 WL 7447619, at *2 (E.D. Cal. Dec. 31, 2014). For tort claims under the FTCA arising out of the

14

1  course of federal employment, 28 U .S.C. § 2679(d) states that "[u]pon certification by the
2  Attorney General that the defendant employee was acting within the scope of his office or
3  employment at the time of the incident out of which the claim arose, any civil action ...
4  commenced upon such claim in a United States district court shall be deemed an action against the
5  United States ... and the United States shall be substituted as the party defendant." *Id.*

6  A certification by the United States is not conclusive for the purpose of substitution.
*Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995). But a certification is *prima facie* evidence that a federal employee is acting in the scope of her employment. *Pauly v. U.S. Dept. of Agri.,* 348 F.3d 1143, 1151 (9th Cir. 2003). A district court may review the certification of the United States that a federal employee was acting within the scope of his employment. *Lamagno,* 515 U.S. at 420; *Meridian v. Int'l Logistics, Inc. v. United States,* 939 F.2d 740, 745 (9th Cir. 1991). The party seeking review of the certification "bears the burden of presenting evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence." *Green,* 8 F.3d at 698. "The United States remains the named federal defendant 'unless and until the District Court determines that the employee, *in fact,* and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment.'" *Jackson v. Tate,* 648 F.3d 729, 736 (9th Cir. 2011) (quoting *Osborn v. Haley,* 549 U.S. 225, 231 (2007)) (emphasis in original).

FTCA scope of employment determinations are made "according to the principles of *respondeat superior* of the state in which the alleged tort occurred." *Pelletier v. Federal Home Loan Bank,* 968 F.2d 865, 876 (9th Cir. 1992) (citations omitted). Here, California law applies.

California extends respondeat superior liability to cases where "'the risk was one "that may fairly be regarded as typical of or broadly incidental" to the enterprise undertaken by the employer.'" *Mary M. v. City of Los Angeles,* 54 Cal. 3d 202 (1991) (quoting *Perez v. Van Groningen & Sons, Inc.,* 41 Cal. 3d 962 (1986) (citation omitted)). Under this rule, even "[t]ortious conduct that violates an employee's official duties or disregards the employer's express orders may nonetheless be within the scope of employment." *Id.* An assault or battery committed by an employee is within the scope of employment even if it violates the employer's direct orders

15

if it results from "a dispute arising out of the employment." *Carr v. Wm. C. Crowell Co.,* 28 Cal. 2d 652 (1946) (employee of general contractor who threw hammer at employee of subcontractor during work-related dispute acted within scope of employment). Only where an employee "substantially departs from his duties for purely personal reasons" will liability fail to attach. *John R. v. Oakland Unified Sch. Dist.,* 48 Cal. 3d 438 (1989).

Here, the United States Attorney's Office certified that Turner-Nichols was acting within the course and scope of her employment at all times material to the alleged incidents pursuant to 28 U.S.C. § 2679(d). ECF No. 22. Snipes disputes the certification, which functionally amounts to challenging the Attorney General's certification. The Attorney General's certification is *prima facie* evidence that the federal employee was acting within the scope of his employment, and Snipes "bears the burden of presenting evidence and disproving the Attorney General's certification by a preponderance of the evidence." *Billings v. United States,* 57 F.3d 797, 800 (9th Cir. 1995). The mere allegation that Turner-Nichols forced her to make a phone call in her office to her parents and disclose details as they pertain to her private life does not constitute proof by a preponderance of the evidence that Turner-Nichols acted beyond the scope of her employment. *White v. Soc. Sec. Admin.,* 111 F. Supp. 3d 1041, 1050 (N.D. Cal. 2015) ("Because Plaintiffs have presented no evidence, as opposed to allegations, that might disprove the Attorney General's certification, at this time the United States '"must remain the federal defendant in the action."'"). Snipes provided no evidence to overcome the Attorney General's certification and thus has failed to meet her burden of disproving the scope of employment by a preponderance of the evidence. Accordingly, Turner-Nichols and the VA must be dismissed as defendants on these tort claims.

**D.** *Bivens* **Claim**

Fourth, Defendants argue that the Court should refuse to imply a *Bivens* remedy for the alleged violation of Snipes's federal constitutional right to privacy. Mot. at 19. Defendants argue that with respect to federal workplace misconduct and discrimination claims, Title VII, the CSRA and the Privacy Act are available alternatives that preempt any *Bivens* claim. *Id.* Snipes argues that the Constitution establishes that employees have a right to privacy and, as a result, there should be no question that, as alleged, Defendants violated this constitutional right when Turner-

16

Nichols ordered Snipes "to disclose information regarding personal sexual matters" to her supervisor and her parents. Opp. to Mot. at 18.

In *Bivens*, the Supreme Court "recognized for the first time an implied right of action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (per curiam) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)). Since *Bivens*, the Supreme Court has only expanded this "implied cause of action" twice. *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1854 (2017). In *Davis v. Passman*, the Court provided a *Bivens* remedy under the Fifth Amendment's Due Process Clause for gender discrimination. 442 U.S. 228 (1979). In *Carlson v. Green*, the Court expanded *Bivens* under the Eighth Amendment's Cruel and Unusual Punishments Clause for failure to provide adequate medical treatment to a prisoner. 446 U.S. 14 (1980). Otherwise, "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *Abbasi*, 137 S.Ct. at 1857 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), and has consistently declined to expand this limited remedy.

Recently, the Ninth Circuit found a *Bivens* remedy under the Fifth Amendment due process clause where a government attorney intentionally submitted a forged document in an immigration proceeding to completely bar an individual from pursuing relief to which he was entitled. *Lanuza v. Love*, 899 F.3d 1019, 1034 (9th Cir. 2018). As noted by the Ninth Circuit in *Love*, if the court determines that the plaintiff is seeking a *Bivens* remedy in a new context (as was the case in *Love*), the court must then determine whether "special factors counsel[ ] hesitation," i.e., "the most important question ... is 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* at 1028 (quoting *Abbasi*, 137 S. Ct. at 1860). "[T]o be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Abbasi*, 137 S. Ct. at 1857-58. In *Love*, the Ninth Circuit determined that the special factors did not counsel against extending a *Bivens* remedy to the narrow claim where an immigration official and officer of the court forged and submitted evidence in a deportation proceeding to deprive an individual of his right to relief under congressionally enacted laws.

*Love*, 899 F.3d at 1028.

In the present case, alternate remedies are available in the form of Title VII, CSRA, and the Privacy Act. *Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 834 (1976) ("Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment."); *Clemente v. U.S.*, 766 F.2d 1358, 1364 n.7 (9th Cir. 1985) ("To the extent that plaintiff's *Bivens* claims are founded in actions proscribed by Title VII, they may not be maintained because Title VII provides the exclusive remedy"). The Title VII and CSRA remedies have been described above. As to the Privacy Act, the Supreme Court has held that the Privacy Act "contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *F.A.A. v. Cooper*, 132 S. Ct. 1441, 1446 (2012). Further, the Privacy Act allows for individuals to file civil actions for actual damages resulting from intentional or willful violations of the Act by government agencies. *Id.*

In *Fazga v. Federal Bureau of Investigation*, the Ninth Circuit held that the Privacy Act supplants *Bivens* claims for First and Fifth Amendment violations. No. 12-56867, 2019 WL 961953, at *31 (9th Cir. Feb. 28, 2019). The Ninth Circuit also highlighted that "a *Bivens* remedy may be foreclosed even when the available statutory remedies do not provide complete relief for a plaintiff, as long as the plaintiff ha[s] an avenue for some redress." *Id.* (quoting *W. Radio Servs.*, 578 F.3d at 1120 (citation omitted)). The Ninth Circuit decision follows two others which held that the Privacy Act supplants *Bivens* claims for First and Fifth Amendment violations. *See Wilson v. Libby*, 535 F.3d 697, 707–08 (D.C. Cir. 2008) (holding, in response to claims alleging harm from the improper disclosure of information subject to the Privacy Act's protections, that the Privacy Act is a comprehensive remedial scheme that precludes an additional *Bivens* remedy); *Downie v. City of Middleburg Heights*, 301 F.3d 688, 696 & n.7 (6th Cir. 2002) (holding that the Privacy Act displaces Bivens for claims involving the creation, maintenance, and dissemination of false records by federal agency employees).

By way of the Privacy Act Congress has already legislated on the subject matter of "those injured by government officials' disclosure of certain private information by setting up a 'comprehensive legislative scheme.'" *Downie v. City of Middleburg Heights*, 301 F.3d 688, 696-

18

697 (6th Cir. 2002) (citation omitted); 5 U.S.C. § 552a. In her complaint, Snipes essentially affirms the fact that the subject matter of her proposed claims has been legislated by the Privacy Act when she alleges that "Upon information and belief, the VA, through its executives, managers and supervisory personnel, permitted and tolerated a pattern and practice of violating the constitutional right to privacy of its employees; and the VA maintained a system of training and supervision that allowed managers to violate constitutional privacy rights of employees with impunity." SAC ¶ 75. Here, Snipes describes an issue that falls under the purview of the Privacy Act. *Fazaga*, No. 12-56867, 2019 WL 961953, at *31 ("Under § 552a(e)(7) [the Privacy Act], an agency that maintains a system of records shall maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity. When an agency fails to comply with § 552a(e)(7), an individual may bring a civil action against the agency for damages.") (internal quotation and citation omitted). Accordingly, the Court will not imply a *Bivens* remedy in this context, and Snipes's *Bivens* claim is dismissed.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' motion and dismisses Snipes's seventh cause of action without leave to amend. The Court dismisses Snipes's fifth and sixth causes of action without leave to amend as to Turner-Nichols and the VA, and with leave to amend as against the United States. Snipes may file a Third Amended Complaint within 30 days.

**IT IS SO ORDERED.**

Dated: March 20, 2019

THOMAS S. HIXSON
United States Magistrate Judge

19